UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORENZO ROGAN,

                Plaintiff,           Civil Action No. 19-13477

v.                                David R. Grand
                                United States Magistrate Judge[1]

JEFFREY BUDZYNOWSKI, *et al.*,

                Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 20, 21)

On November 25, 2019, plaintiff Lorenzo Rogan ("Rogan") filed the instant action against three law enforcement officers – Jeffrey Budzynowski and Frank Ventimiglio of the Macomb County Sheriff's Office, and Dan Quinn of the Clinton Township Police Department.[2] (ECF No. 1). In his complaint, Rogan alleges that, on March 29, 2018, he was arrested without a warrant and subjected to excessive force by the defendants. He pleads claims under both state and federal law.

On January 7, 2022, the defendants filed two separate motions for summary judgment. (ECF Nos. 20, 21). On January 28, 2022, Rogan filed a single response to both motions (ECF No. 22), and on February 8 and 10, 2022, the defendants filed reply briefs

_____

[1] The parties have consented to the undersigned exercising jurisdiction over all proceedings in this civil action pursuant to 28 U.S.C. § 636(c)(1). (ECF No. 11).

[2] Also named as a defendant in this action was Michael McMillan. However, an Order of Dismissal was entered as to Mr. McMillan on July 21, 2021. (ECF No. 15).

(ECF Nos. 23, 24). The Court heard oral argument on the defendants' motions on April 7, 2022. The Court then referred the case for a settlement conference, but no settlement was reached. Subsequently, the parties filed supplemental briefs in support of their respective positions, Rogan on May 18, 2022,[3] and the defendants on May 20 and 26, 2022. (ECF Nos. 29, 30, 31).

For the reasons set forth below, the Court will grant in part and deny in part the defendants' motions for summary judgment.

## A.    Factual Background

### 1.    Events Prior to March 29, 2018

By way of background, Rogan testified at his deposition that he has a fairly extensive criminal history, with approximately seven prior criminal convictions. (ECF No. 20-4, PageID.166). In January 2018, Rogan was wanted out of Clinton Township on a warrant for home invasion, domestic violence, unarmed robbery, and larceny in a building. (ECF No. 20-2, PageID.126; ECF No. 20-19, PageID.331).

Detective Quinn, Detective/Sergeant Ventimiglio, and Lieutenant Budzynowski are all members of a multi-jurisdictional Detroit Fugitive Apprehension Team ("DFAT"). (ECF No. 20-2, PageID.126; ECF No. 20-3, PageID.138; ECF No. 22, PageID.575-76).

---

[3] In their supplemental briefs, the defendants assert that Rogan's supplemental brief "must be stricken for failure to comply with the controlling court rules." (ECF No. 30, PageID.865; *see also* ECF No. 31, PageID.885). As the defendants correctly point out, Rogan's 37-page brief exceeds the 25-page limitation imposed by E.D. Mich. LR 7.1(d)(3)(A) and uses an impermissibly small font. While the Court is sensitive to the defendants' concerns, it will not strike Rogan's filing, as the Court itself invited supplemental briefs and did not impose a specific page limitation. However, in the future, the parties and counsel must fully comply with the Court's rules.

According to a report prepared by Ventimiglio, on January 23, 2018, the DFAT received information that Rogan was believed to be at Innovative Tool, his place of employment, in Macomb County. (ECF No. 29-1, PageID.860). When DFAT members arrived at Innovative Tool that day, they were informed that Rogan was present and would be escorted to the front office. (*Id.*). However, Rogan allegedly "ran out the door"; "sped through the parking lot at a high rate of speed"; and fled the scene.[4] (*Id.*).

According to Ventimiglio's report, over the next two months, the DFAT met with Rogan's known associates and conducted surveillance at multiple locations in an effort to locate him, but they were unsuccessful. (*Id.*, PageID.861). On March 27, 2018, Quinn verified that the warrant for Rogan was still valid. (*Id.*). On both March 27 and 28, 2018, DFAT members conducted surveillance at multiple locations with negative results. (*Id.*; ECF No. 20-2, PageID.127).

On March 28, 2018, Rogan turned himself in on the warrant at the 41-B District Court, at which time he was released. (ECF No. 20-4, PageID.169). According to Rogan, he saw Quinn in court that day and spoke with him. (*Id.*, PageID.171).[5] Specifically, Rogan alleges that he voiced a question about "exculpatory evidence" related to his underlying case, and that Quinn responded to his question. (*Id.*). While Quinn admits he was at the 41-B District Court on March 28, 2018, he denies seeing Rogan there or speaking with him. (ECF No. 20-2, PageID.127).

---

[4] According to Rogan, he did not flee from the DFAT officers; rather, he claims he simply left the building because his shift was over. (ECF No. 20-4, PageID.182-83).

[5] Although this was Rogan's unequivocal testimony, Rogan's counsel also initially answered the question for him, which was highly improper. (*Id.*).

2.      *Events Taking Place on March 29, 2018*

The next day, March 29, 2018, Ventimiglio allegedly located Rogan's vehicle at Rogan's mother's assisted living complex, Canaan Manor, in Detroit, Michigan, and contacted Quinn to so advise him.   (ECF No. 20-3, PageID.140; ECF No. 20-2, PageID.127).   As a result, Quinn headed to Canaan Manor to meet Ventimiglio and assist the DFAT with Rogan's apprehension.[6]  (ECF No. 20-2, PageID.127).

When the officers arrived at Canaan Manor, they were wearing tactical gear and were armed with assault rifles.   (*Id.*, PageID.129; ECF No. 20-4, PageID.172).   According to Rogan, after Canaan Manor residents alerted him to the officers' presence, he came down the stairwell and entered the lobby.   (ECF No. 20-4, PageID.170).   Rogan testified that Quinn asked his name, and when Rogan identified himself, he was handcuffed[7] and advised that he was under arrest.   (*Id.*, PageID.170; *see also* ECF No. 20-2, PageID.129).

At that time, Rogan advised the officers that he had turned himself in on the warrant the day before.[8]  (ECF No. 20-4, PageID.172).   He claims the "advisement of rights" form he had received from the court was in his pocket, and he attempted to present it to the officers.   (*Id.*).   Rogan was advised that the officers would verify the warrant status and that if the warrant had been cleared, he would be released.   (ECF No. 20-2, PageID.129).

---

[6] At his deposition, Budzynowski testified that he was not present at Canaan Manor at the time of the events in question and had no involvement in the decision to apprehend Rogan.  (ECF No. 22, PageID.577-78).  Rather, he was merely briefed by Ventimiglio after the incident occurred.  (*Id.*).

[7] Ventimiglio testified that Rogan was handcuffed because of his prior attempt to elude the officers on January 23, 2018.  (ECF No. 20-3, PageID.145).

[8] Rogan testified at his deposition that he could tell from Quinn's "body language, his eyes" that Quinn recognized him from court.  (ECF No. 20-4, PageID.171).

4

Ventimiglio then left the lobby to confirm Rogan's claim that the warrant was no longer valid.  (ECF No. 20-4, PageID.173).

Rogan alleges that, while Ventimiglio was gone, Quinn assaulted him.  Quinn claims that, despite being advised that he would be released immediately if the warrant had been cleared, Rogan continued to yell, spit, and spray saliva all over Quinn's face.  (ECF No. 20-2, PageID.130).  Rogan admits that Quinn placed a hand over Rogan's mouth and told him to "stop spitting."  (ECF No. 20-4, PageID.172).  Rogan claims that Quinn then grabbed him, tried (unsuccessfully) to "slam" him to the ground, and then pushed him up against a wall.  (*Id.*).  While Rogan was against the wall, Quinn allegedly pinched his neck, pushed on his Adam's apple, and rammed him against the wall a second time, making a hole in the plaster that Rogan later had to pay to fix.  (*Id.*).  Quinn claims that, to prevent Rogan from continuing to spray saliva, he merely used an open hand to "direct[]" Rogan's face away from his.  (ECF No. 20-2, PageID.130).  He then secured Rogan by placing his feet next to Rogan's, getting him off balance, and directing him to a bench.  (*Id.*).

A short time later, Ventimiglio returned to the lobby and advised Rogan that his warrant status had, in fact, changed the afternoon before.[9]  (ECF No. 20-4, PageID.173).  Rogan's handcuffs were removed, and he was released.  (ECF No. 20-3, PageID.142).  The entire incident took approximately 15-20 minutes.  (*Id.*).

---

[9] According to the defendants, when Rogan turned himself in on March 28, 2018, he was specifically instructed to report to the Clinton Township Police Station for processing on the warrant.  (ECF No. 20-2, PageID.128).  Had Rogan done so, he would have been fingerprinted and booked, at which time the defendants would have been made aware of the change in the warrant's status.  (*Id.*, PageID.129).

On November 25, 2019, Rogan filed his complaint in the instant action, pleading seven causes of action: (1) gross negligence; (2) violation of his Fourth and Fourteenth Amendment rights to be free from excessive force and secure in his person, pursuant to 42 U.S.C. § 1983; (3) civil conspiracy, pursuant to § 1983; (4) "municipal/supervisory liability," pursuant to § 1983; (5) assault and battery; (6) intentional infliction of emotional distress; and (7) malicious prosecution.  (ECF No. 1).  The defendants now move for summary judgment, arguing that there is no genuine issue of material fact as to any of Rogan's claims.

### B.    Standard of Review

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir.

6

2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)).  Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).  "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."  *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

The United States Supreme Court has made clear that video evidence substantiating one party's version of events can serve as controlling evidence at the summary judgment stage.  *See Scott v. Harris*, 550 U.S. 372, 380-381 (2007).  In *Scott*, the Court considered video evidence that came from a camera inside a police car and allowed that evidence to resolve the parties' conflicting factual accounts.  *Id.* at 380.  The Court refused to accept the plaintiff's version of the events because it was directly contradicted by the video evidence.  *Id.*  The Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for

7

summary judgment." *Id.*; *see also Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 527 (6th Cir. 2018) (where there is a videotape capturing the events in question, the court must view those facts in the light depicted by the videotape).

## C.     Analysis

As set forth above, Rogan pleads several causes of action against Ventimiglio and Quinn,[10] including: (1) gross negligence; (2) violation of his Fourth and Fourteenth Amendment rights to be free from excessive force and secure in his person; (3) civil conspiracy; (4) assault and battery; (5) intentional infliction of emotional distress; and (6) malicious prosecution. (ECF No. 1). Each of these claims is addressed below.

### 1.     *Rogan's Gross Negligence Claim*

In Count I of his complaint, Rogan pleads a state-law claim for gross negligence. Specifically, Rogan alleges that Ventimiglio and Quinn owed him "a duty to perform their law enforcement duties competently without causing unnecessary injury or harm." (*Id.*, PageID.4). Rogan then alleges that Quinn and Ventimiglio breached these duties "by

---

[10] Rogan pleads only one claim against Budzynowski, for "municipal/supervisory liability" pursuant to 42 U.S.C. § 1983. (ECF No. 1, PageID.7-9). Specifically, Rogan appears to allege that Budzynowski is liable for Quinn's and Ventimiglio's alleged violation of his Constitutional rights because he was the DFAT supervisor. (*Id.*). But, *respondeat superior* liability does not exist under § 1983. *See Winkler v. Madison Cty.*, 893 F.3d 877, 898 (6th Cir. 2018). Rather, supervisory liability requires some "active unconstitutional behavior" on the part of the supervisor. *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). At the very least, the plaintiff must show that the defendant "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Peatross v. City of Memphis*, 818 F.3d 233, 241-42 (6th Cir. 2016) (internal quotations omitted). Here, Budzynowski testified at his deposition that he was not present at Canaan Manor at the time of the events in question and had no involvement whatsoever in the decision to apprehend Rogan. (ECF No. 22, PageID.577-78). Rogan has presented no evidence suggesting otherwise or that Budzynowski somehow encouraged the actions of the other defendants. Thus, the Court will grant summary judgment in favor of Budzynowski on Rogan's municipal/supervisory liability claim (Count IV).

improperly, without justifiable reason or provocation, forcibly detaining, assaulting and battering [him]." (*Id.*). And, even more specifically, Rogan alleges that Quinn acted grossly negligently when he "choked [him], slammed [him] into a wall, slammed his head into a wall, and then threw [him] face down onto a bench while apply[ing] pressure to his backside, which constitutes unreasonable and excessive force." (*Id.*). Rogan further alleges that Ventimiglio was grossly negligent when he "failed to intervene" and stop Quinn's application of excessive force. (*Id.*, PageID.5). Thus, there appear to be two aspects to Rogan's gross negligence claim – forcible detention in the absence of a warrant and excessive force.

In their motion for summary judgment, the defendants argue that they are immune from liability for gross negligence pursuant to MCL 691.1407(2). (ECF No. 20, PageID.106-07). That statutory provision states that each officer and employee of a governmental agency is immune from tort liability for an injury to a person caused by the officer while in the course of employment or service if: the officer is acting within the scope of his authority; the governmental agency is engaged in the exercise or discharge of a governmental function; and the officer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. *See* MCL 691.1407(2). Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). It is important to note that the statute does not create a cause of action known as "gross negligence" but, rather, references the degree of negligence that may expose a governmental officer or employee to liability. *See Cummins v. Robinson Twp.*, 283 Mich. App. 677, 692 (2009).

Accordingly, a plaintiff must plead and prove that the defendant at issue committed an underlying tortious act in a grossly negligent manner.  *See Beaudrie v. Henderson*, 465 Mich. 124, 139 (2002).  Here, there are two such alleged torts: excessive force during Rogan's arrest; and the warrantless forcible detention itself.

The Court begins with Rogan's gross negligence claim related to Quinn's alleged use of excessive force.  The entirety of the defendants' argument for summary judgment consists of the following statements:

> Detective Quinn's use of an open hand to direct the Plaintiff's saliva away does not represent gross negligence.  Detective Quinn's conduct of securing the Plaintiff against the wall when the Plaintiff admittedly yanked himself away from Detective Quinn does not represent gross negligence.  The Plaintiff's claim fails accordingly.

(ECF No. 20, PageID.106-07) (internal citations omitted).  This argument fails to recognize that Rogan alleges Quinn did far more than merely use an "open hand to direct [] saliva away."[11]  Rogan claims Quinn violently pushed him back into a chair, then attacked him from behind and smashed him into the wall near a bench.  Rogan further testified that Quinn pinched his Adam's apple, preventing him from breathing, tried to trip him, and

---

[11] Citing *People v. Moreno*, 491 Mich. 38 (2012), Rogan argues that he was not in the wrong when he spat at Quinn because, in Michigan, "citizens have a right to object to unlawful arrests – even to the point of using deadly force."  (ECF No. 22, PageID.560).  According to Rogan, then, his arrest on an invalid warrant put both Rogan and the public "in potential mortal danger – all within [Rogan's] legal self[-]defense rights" – and, thus, was grossly negligent.  (*Id.*, PageID.561).  But, *Moreno* does not stand for the proposition that an individual may resist *any* unlawful arrest through the use of deadly force.  *See People v. Dillard*, 115 Mich. App. 640, (1982) (defendant had a right to resist an unlawful arrest, so long as the force used was "reasonably necessary").  Here, contrary to Rogan's assertions, none of the defendants' actions would have justified the use of deadly force.  Moreover, *Moreno* only provides that an individual has a right to resist an unlawful arrest for the purposes *of MCL 750.81d*, which sets forth the felony of resisting arrest.  Here, where Rogan was never charged with resisting arrest under MCL 780.81d, *Moreno* is inapplicable.

repeatedly slammed him into a wall.  Thus, there exists a dispute as to the type and level of force Quinn applied to Rogan during the altercation.

Nevertheless, because Rogan's allegations supporting this aspect of his gross negligence claim are based on the exact same facts as his excessive force claim, his gross negligence claim fails as a matter of law.  As the Honorable Bernard A. Friedman recently explained in *Knight v. Hughes*, No. 20-10574, 2022 WL 2679423, at *2 (E.D. Mich. July 11, 2022):

> Michigan law does not recognize "gross negligence" as an independent cause of action where the underlying facts support an intentional tort allegation.  *See Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011) ("[a]lthough establishing that a governmental official's conduct amounted to 'gross negligence' is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action."); *see also Latits v. Phillips*, 298 Mich. App. 109, 120, 826 N.W.2d 190 (2012) ("this Court has rejected attempts to transform claims involving elements of intentional torts into gross negligence.").

> Because the gross negligence claim rests on precisely the same facts as the excessive force and assault and battery claims, Knight fails to state a claim for gross negligence under Michigan law.  *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 701 (6th Cir. 2018); *see also McArn v. Clark*, No. 19-13703, 2021 WL 4710749, at *——, 2021 U.S. Dist. LEXIS 194619, at *24 (E.D. Mich. Oct. 8, 2021) (dismissing gross negligence claim where it was "based on precisely the same facts as [the plaintiff's] intentional tort claims."); *Townsend v. Owens*, No. 12-10379, 2012 WL 3300988 at *2, 2012 U.S. Dist. LEXIS 113668 at *6-7 (E.D. Mich. Aug. 13, 2012) ("[I]t is well-established that an intentional tort claim, like the allegation here that excessive force was used, cannot be converted into a claim of gross negligence.").

*Knight*, 2022 WL 2679423, at *2.  Accordingly, the Court will grant defendants' summary judgment motion as it relates to this particular aspect of Rogan's gross negligence claim.

As to the alleged warrantless forcible detention, Rogan essentially presents three separate gross negligence theories: (1) that both Quinn and Ventimiglio were grossly negligent in failing to check the status of the warrant prior to arresting him at Canaan Manor; (2) that Quinn and Ventimiglio were grossly negligent by arresting Rogan when they knew the warrant for his arrest had been vacated; and (3) that when Ventimiglio contacted Quinn and asked for assistance arresting Rogan, Quinn was grossly negligent in failing to advise Ventimiglio that the warrant had been vacated a day earlier. Of these, only the last one survives defendants' summary judgment motion.

There is no dispute that the defendants did not verify the warrant's validity on the date of Rogan's apprehension. Indeed, Quinn admits as much, indicating that he usually begins his workday by checking the status of warrants, but because he did not begin his day working with the DFAT, he did not do so in this instance. (ECF No. 20-2, PageID.127). He further indicated that, typically, someone else on the DFAT would verify a warrant's validity, but that apparently was not done in this case. (*Id.*, PageID.128). At the same time, the record is clear that there had been a longstanding warrant for Rogan's arrest and that Ventimiglio and Quinn had been engaged in a search for Rogan. The officers also claim Rogan had fled a prior attempt to arrest him, and while Rogan says he merely left work, he presented no evidence that the officers knew that to be the case. On these facts, Rogan simply has not presented sufficient evidence that defendants' failure to re-check the warrant status on the day in question constitutes "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). Accordingly, to the extent Rogan's gross negligence claim is premised on

that conduct, the Court will grant summary judgment.

To the extent Rogan's gross negligence claim is premised on the defendants' arrest of Rogan allegedly knowing that the warrant had been vacated, defendants are also entitled to summary judgment. Under those alleged facts, the warrantless arrest by defendants would be an intentional act. For the same reasons explained above, under Michigan law, such intentional conduct cannot form the basis of a gross negligence claim. *See supra* at 11; *Knight*, 2022 WL 2679423, at *2.[12]

The analysis is different as to Rogan's claim that Quinn acted in a grossly negligent manner when, in response to Ventimiglio's request for help apprehending Rogan on March 29, 2018, Quinn failed to advise Ventimiglio that the warrant had been vacated. (ECF No. 29, PageID.665) (asserting that it was grossly negligent "for Quinn to hold back the knowledge that [Rogan's] warrant was not valid prior to execution of the warrant. Quinn could have easily informed Ventimiglio that he had been in court [the day before] conversing with [Rogan] about the case" and the fact that the warrant was vacated). Rogan testified at his deposition that Quinn was present in court the day before his apprehension, and was aware that Rogan had turned himself in and that the warrant was lifted. (ECF No. 20-4, PageID.169, 171). Although Quinn denies seeing or talking with Rogan in 41-B

---

[12] Ventimiglio is entitled to summary judgment for another reason. The undisputed record evidence establishes that he was not present at the time of Quinn's alleged application of excessive force and, thus, could not have been grossly negligent in failing to intervene, as Rogan alleges in his complaint. (ECF No. 20-4, PageID.172-73). *See, e.g., Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (to establish liability for failure to intervene in another officer's excessive use of force, the plaintiff must demonstrate "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring") (internal quotations omitted).

District Court on March 28, 2018, he admits to being in that court, and the Court must accept Rogan's evidence as true. On the present record, a reasonable jury could find that in response to Ventimiglio's request for assistance apprehending Rogan on March 29, 2018, Quinn's failure to advise that the warrant had been vacated the day before, knowing it would lead to Rogan's warrantless arrest, constitutes "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). Accordingly, as to this aspect of Rogan's gross negligence claim only, summary judgment is not warranted in Quinn's favor, and the motion will be denied.

### 2.    *Rogan's § 1983 Excessive Force Claim*[13]

In Count II, Rogan alleges that Quinn[14] violated his Fourth Amendment[15] right to be free from excessive force. (ECF No. 1, PageID.5-6). In their motions for summary judgment, the defendants argue that they are entitled to qualified immunity and summary judgment on Rogan's § 1983 excessive force claim because there was no violation of a

---

[13] Although Rogan makes a vague reference in his supplemental brief to the fact that "[i]nitiating an arrest without a warrant is inherently unreasonable," his § 1983 claim stems entirely from the alleged application of excessive force. (ECF No. 1, PageID.5-6). Moreover, Rogan's counsel confirmed at oral argument that there is no false arrest claim in the complaint. Thus, the Court will focus on Rogan's allegations of excessive force.

[14] Although Rogan also pleads Count II against Ventimiglio, he testified at his deposition that Ventimiglio did not subject him to *any* force whatsoever and, indeed, was not present at the time of Quinn's alleged use of excessive force. (ECF No. 20-4, PageID.172-73). Thus, to the extent Rogan's complaint pleads a § 1983 excessive force claim against Ventimiglio, summary judgment is warranted on such a claim.

[15] Rogan also references the Fourteenth Amendment in Count II of his complaint; however, the law makes clear that it is "[t]he Fourth Amendment's prohibition against unreasonable seizures of the person [that] applies to excessive-force claims that arise in the context of an arrest or investigatory stop of a free citizen …." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010) (internal citations and quotations omitted).

clearly established constitutional right.[16]   For the reasons set forth below, the Court disagrees.

The doctrine of qualified immunity insulates state actors from liability in close-call situations. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) (explaining that the defense is intended to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct). Once the qualified immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016). A plaintiff must satisfy both of these prongs, but the Court may take up the questions in whichever order it sees fit. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (*abrogating in part Saucier*, 533 U.S. at 201).

Under the Fourth Amendment, a police officer, in the course of making an arrest, investigatory stop, or other "seizure" of a person may use only such force as is objectively reasonable under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 397 (1989). Under the "objective reasonableness" standard, a court analyzes whether "the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. Reasonableness is determined by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged

---

[16] The qualified immunity defense may be raised at any stage of the case. Where, as here, it is raised in a motion for summary judgment, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *See Scott*, 550 U.S. at 377-78.

to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotations and citations omitted).

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotations and citation omitted). Determining whether there has been a Fourth Amendment violation by an individual officer requires consideration of "(1) the severity of the crime at issue; (2) the threat of immediate danger to the officers or bystanders; and (3) the suspect's attempts to resist arrest or flee." *Wysong v. City of Heath*, 260 F. App'x 848, 854 (6th Cir. 2008) (citing *Graham*, 490 U.S. at 396). "The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.'" *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). Moreover, to determine whether the amount of force exerted by a police officer is excessive, a court must "apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). Courts considering the objective reasonableness of a police officer's actions also must account for "the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. This standard represents "a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v.*

16

*Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

In his motion for summary judgment, Quinn argues that his "use of an open hand to direct [Rogan's] saliva away" and actions in "securing [Rogan] against the wall" represent reasonable force, particularly in light of the "tense, uncertain, and rapidly evolving situation where [Rogan] was becoming belligerent to the point of yelling at the officers and spraying saliva in Detective Quinn's face." (ECF No. 20, PageID.110).  The problem with this argument, however, is that it ignores video and other evidence that was supplied to the Court *after* Defendants filed their summary judgment motion.

Rogan testified that Quinn grabbed him while he was handcuffed, tried (unsuccessfully) to "slam" him to the ground, and then shoved him up against a wall.  (ECF No. 20-4, PageID.172).  While Rogan was against the wall, Quinn allegedly pinched his neck, pushed on his Adam's apple, and rammed him against the wall a second time, making a hole in the plaster that Rogan later had to pay to fix.  (*Id.*).  As part of the supplemental briefing, Rogan provided the Court with a copy of the video in question, as well as a photograph that he contends depicts the hole in the wall that occurred from Quinn slamming him into it.  (ECF No. 29-1, PageID.857).

Defendants filed separate responses to Rogan's supplemental brief, but neither one mentioned the photograph or argued that it does not reflect what Rogan says it does.  The Court also notes that there is about a 15-second period of time when Rogan and Quinn are tussling that is not captured on the video, and Rogan contends that "[t]his blind spot corresponds to one of the throwing/slamming incidents alleged by [him]."  (ECF No. 29, PageID.659).  Because of the way the parties' briefed the issues, it is also not clear that the

parties agree as to who is who in the video.  On the one hand, they both address instances of Quinn applying some level of force to Rogan's face to keep him from spitting on Quinn – and this seems to be clearly depicted in the video once Rogan is placed onto the bench after coming back into view of the camera after about 15 seconds where their scuffle takes place off camera.  However, in his supplemental brief, Rogan asserts, "the video shows on [sic] the Marshall [sic] placing his hands on Plaintiff's face – Quinn's hands are not seen on Plaintiff's face in the video footage whatsoever."  (ECF No. 29, PageID.656).

In short, to the extent Quinn used force to merely direct Rogan's face to the side due to his spitting, the video shows those actions were reasonable and did not constitute excessive force.  Indeed, after the brief period of time when Rogan disappears from the video, Quinn (or the "Marshal") can be clearly seen using an open palm on the side of Rogan's face to push it to the side.  However, at least on the present record, a question remains about whether Quinn applied other force – including by allegedly slamming Rogan into the wall – that was excessive under the circumstances.  Again, Rogan testified that he was slammed into the wall, questions exist about whether it was Quinn or the "Marshal" who directed Rogan's face to the side when he was on the bench, there is a 15-second period of time that is not visible in the video during which Rogan claims he was assaulted, and Rogan provided a photograph of the damage to some unspecified section of the wall allegedly caused when his head was slammed into it by Quinn.  Construing all reasonable inferences in Rogan's favor, a question of fact exists as to whether the force applied by Quinn was excessive.  Accordingly, Quinn is not entitled to summary judgment on Rogan's

Fourth Amendment excessive force.[17]   However, because of the open questions about which officer in the video was Quinn, and thus what conduct depicted in the video Quinn is responsible for, the Court will deny summary judgment without prejudice.  Should Quinn so desire, he may file a renewed summary judgment motion as to that issue within the next 30 days.[18]

The analysis is different with respect to Ventimiglio, however, as he is not alleged to have used force against Rogan and admittedly was not present at the time Quinn did so. In his response to the defendants' dispositive motions, Rogan argues that Ventimiglio is liable under § 1983 pursuant to the "state created danger doctrine."  (ECF No. 22, PageID.555-59).   "Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence."  *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998).   Moreover, "[t]he state must have known or clearly should have known that its actions specifically endangered an individual."  *Id.*

Here, Rogan asserts that he was lawfully present at Canaan Manor; no valid warrant

---

[17] There can be little doubt that, at the time of the events in question, the right to be free from gratuitous violence while handcuffed was clearly established. *See, e.g., Shreve v. Jessamine Cty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006) (explaining that it is clearly established that police cannot use gratuitous violence when there is "no safety risk"); *Malory v. Whiting*, 489 F. App'x 78, 85 (6th Cir. 2012) (recognizing a suspect's clearly established right to be free from violent physical force when he has been subdued and does not present a danger to himself or others).

[18] Any such motion shall be limited to the particular issue described above, *i.e.*, the apparent dispute over which of the two officers engaged with Rogan after he comes back into view of the camera was Quinn, and Quinn's position as to Rogan's allegations that the two tussled off-camera, and that Quinn "slammed" him into the wall, causing the hole shown in the photograph.  Any such motion shall be limited to seven (7) pages.  Rogan may then file a response limited to seven (7) pages within the timeframe provided by the Local Rules.

existed; and he was under "no threat of violence whatsoever" when Ventimiglio "took away his ability to defend himself by handcuffing his hands behind his back … clearly making him more vulnerable to attack than if he had his hands free." (ECF No. 22, PageID.557). There are multiple problems with this argument, however.

First, Rogan concedes in his supplemental brief, after reviewing the video evidence, that it was Quinn, not Ventimiglio, who handcuffed him. (ECF No. 29, PageID.658). Second, even if Ventimiglio had handcuffed Rogan and left him in the presence of another law enforcement officer while he checked on the warrant's status, this fact alone does not establish that Ventimiglio knew or should have known that he was placing Rogan in danger. Indeed, Rogan presented no evidence that Ventimiglio knew Quinn planned to assault Rogan. Finally, Rogan alleges that Ventimiglio took actions that left him exposed to the acts of Quinn, who is not a private individual, which is insufficient. *See Estate of Barnwell by S.C.B. v. Grigsby*, 681 F. App'x 435, 443 (6th Cir. 2017) (to prevail on a claim under the state-created-danger doctrine, "a plaintiff must show a governmental actor put the plaintiff at risk for an injury *committed by a private person*") (emphasis added) (citing cases).

For all of these reasons, Rogan's state-created-danger argument is without merit, and summary judgment in Ventimiglio's favor is warranted on Rogan's § 1983 excessive force claim against him.

### 3.    *Rogan's § 1983 Conspiracy Claim*

In Count III of his complaint, Rogan alleges that Quinn and Ventimiglio were part of a conspiracy to violate his civil rights under § 1983. (ECF No. 1, PageID.6-7). A civil

conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). To succeed on such a claim, Rogan must show that "'(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed' in furtherance of the conspiracy that caused the injury." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Revis*, 489 F.3d at 290).

Here, Rogan alleges that Quinn and Ventimiglio "conspired and committed acts in furtherance of a conspiracy to employ excessive force" against him by, *inter alia*, forcibly detaining him, choking him, slamming him into a wall, and pointing guns at him; allowing an unreasonable assault and battery to take place; and failing to investigate and be fully truthful regarding the circumstances leading to this alleged assault and battery. (ECF No. 1, PageID.6-7). In support of his conspiracy claim, Rogan points out that, between January 2018 and March 27, 2018, the DFAT tried – without success – to locate and arrest him on the underlying warrant. Then, on March 28, 2018, Rogan appeared at the 41-B District Court, where Quinn admittedly was present, at which time Rogan listed his address as Canaan Manor and the warrant was resolved. The very next day, Ventimiglio "located" Rogan at Canaan Manor, at which point DFAT officers showed up there and arrested Rogan. According to Rogan, "Ventimiglio … clearly knew where to find Plaintiff and *could only have done so* from information provided by Quinn obtained in Court the day prior." (ECF No. 29, PageID.684) (emphasis added).[19]

---

[19] While the Court rejects the notion that Ventimiglio could *only* have found Rogan based on information from Quinn, Rogan has at least raised a question of fact that Quinn learned of Rogan's

Viewing the facts in the light most favorable to Rogan, a genuine issue of material fact exists as to whether a plan existed to deprive Rogan of his constitutional rights to be free from illegal seizure and excessive force.   Although it is certainly possible that Ventimiglio located Rogan through some means other than the address Rogan provided to the court just the day before, given the timing of Rogan's arrest – the very day after he had turned himself in, which followed a two-month period of time during which the defendants unsuccessfully searched for him – it would not be purely speculative to conclude otherwise. To the extent Quinn and Ventimiglio cooperated to arrest Rogan on March 29, 2018, despite knowing that the warrant had been cleared the day before, Rogan could establish the elements of a § 1983 conspiracy claim.   For these reasons, summary judgment is inappropriate on Rogan's conspiracy claim.

### 4.      *Rogan's Assault and Battery Claim*

In Count V of his complaint, Rogan pleads a state-law claim for assault and battery. (ECF No. 1, PageID.9-10).  Specifically, Rogan alleges that Quinn and Ventimiglio "made an intentional, unlawful threat to do bodily injury to Plaintiff by force, under circumstances which created in Plaintiff a reasonable fear of imminent peril" and which threat "was coupled with the apparent present ability of the Defendants to carry out the act if not prevented." (*Id.*).  Rogan further alleges that Quinn and Ventimiglio "intentionally caused an uncontested touching of Plaintiff against his will and without justification." (*Id.*).

---

presence there from the 41-B Court hearing the day before, and Quinn's presence on the day in question alongside Ventimiglio raises a question as to Ventimiglio's knowledge of Rogan's location and the status of the warrant.

In their motions for summary judgment, Quinn and Ventimiglio assert that they are immune from liability for assault and battery.  (ECF No. 20, PageID.116-17; ECF No. 21, PageID.350-51).  Because assault and battery are intentional torts under Michigan law, the defendants must establish that they are entitled to individual governmental immunity by showing the following: the acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority; the acts were undertaken in good faith, or were not undertaken with malice; and the acts were discretionary, as opposed to ministerial.  *See Odom v. Wayne Cty.*, 482 Mich. 459, 480 (2008).

Evaluating the defendants' arguments for immunity in light of this framework, summary judgment is not warranted.  As to the first prong, the actions of both Ventimiglio and Quinn – in locating Rogan at Canaan Manor, assembling the DFAT, detaining Rogan, verifying his claim that the warrant was no longer valid, and releasing him – were clearly within the scope of their authority as law enforcement officers.  And, as to the third prong, it is equally apparent that these actions were discretionary, as opposed to ministerial, in nature.  At issue, then, is the second prong of the test for immunity – whether Ventimiglio's and Quinn's actions were taken in good faith or were not undertaken with malice.

Ventimiglio argues that his actions, "especially leaving the [] Canaan [Manor] lobby to verify Plaintiff's claim," were taken in good faith and without malice.  (ECF No. 21, PageID.351).  Similarly, Quinn asserts that he "acted in good faith when he secured [Rogan] against the wall when [Rogan] attempted to yank himself away" and "used an open hand to direct [Rogan's] spit away."  (ECF No. 20, PageID.117).  Such conclusory

allegations are insufficient, however, to warrant granting summary judgment.  As set forth above, viewing the evidence in the light most favorable to Rogan, which the Court must do at the summary judgment stage, Quinn knew that Rogan had turned himself in on the underlying warrant and either alerted Ventimiglio to the address provided by Rogan to the court or at least allowed Rogan to be handcuffed knowing the warrant had been resolved. Although Quinn and Ventimiglio argue that their actions were entirely proper, a genuine issue of material fact exists as to whether they were acting in good faith or without malice. Thus, summary judgment on Rogan's assault and battery claim is denied.[20]

### 5.  *Rogan's Intentional Infliction of Emotional Distress Claim*

In Count VI of his complaint, Rogan pleads a claim for intentional infliction of emotional distress ("IIED").  (ECF No. 1, PageID.10-11).  To succeed on such a claim, Rogan must show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress.  *See Lewis v. LeGrow*, 258 Mich. App. 175, 196 (2003).  To be actionable, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  *Doe v. Mills*, 212 Mich. App. 73, 91 (1995).

Because a genuine issue of material fact exists that Rogan was wrongfully arrested, assaulted, and subjected to excessive force, summary judgment is denied as to Rogan's

---

[20] For the same reasons set forth above, in connection with the Court's discussion of Rogan's gross negligence and excessive force claims, Ventimiglio cannot be held liable for battery, as he did not engage in a "harmful touching" of Rogan, nor was he present when Quinn allegedly did so.

IIED claim.  *See Thomas v. Lambert*, No. 19-11046, 2022 WL 1274950, at *7 (E.D. Mich.

Apr. 28, 2022) ("IIED claims are based on Defendants falsely arresting and imprisoning

Plaintiffs, which is a viable basis for an IIED claim in Michigan.") (citing *Minor v. City of*

*Sylvan Lake*, No. 314220, 2014 WL 6686682, at *13 (Mich. Ct. App. Nov. 25, 2014));

*Niewolak v. Bartynsky*, No. 19-13386, 2022 WL 2820088, at *12 (E.D. Mich. July 19,

2022) ("Because there is a genuine issue of material fact as to whether excessive use of

force was applied, it follows that a reasonable jury could find that [the plaintiff] did in fact

suffer [IIED] due to Defendant Officers' conduct.").

### 6. *Rogan's Malicious Prosecution Claim*

Lastly, in Count VII of his complaint, Rogan pleads a claim for malicious

prosecution.  The elements of this intentional tort are: (1) the defendant initiated a criminal

prosecution against the plaintiff; (2) the criminal proceedings terminated in the plaintiff's

favor; (3) the person "who instituted or maintained the prosecution lacked probable cause

for his actions"; and (4) "the action was undertaken with malice or a purpose in instituting

the criminal claim other than bringing the offender to justice."  *Matthews v. Blue Cross &*

*Blue Shield of Mich.*, 456 Mich. 365, 378 (1998).  Moreover, Michigan courts have

recognized that the only situation in which an action for malicious prosecution properly

lies is where a police officer knowingly swears to false facts in a complaint, without which

there is no probable cause.  *See Payton v. City of Detroit*, 211 Mich. App. 375, 395 (1995).

Here, summary judgment is warranted on Rogan's malicious prosecution claim, as

his criminal prosecution was not initiated or maintained by either Ventimiglio or Quinn.

Indeed, the police report related to the underlying charge against Rogan was prepared by

reporting officer Joseph Fix, and it was reviewed by Nicholas Mixon on December 25, 2017.  (ECF No. 20-17).  In addition to the December 25, 2017, police report, Officer Fix prepared a Domestic Violence Supplemental Report.  (ECF No. 20-18).  Also on December 25, 2017, Detective J. Hertel prepared a Request for Warrant Authorization.  (ECF No. 20-19).  Thus, the record is clear that neither Ventimiglio nor Quinn was involved in requesting the warrant at issue in this case.[21]  Consequently, no genuine issue of material fact exists, and summary judgment is granted in favor of the defendants on Rogan's malicious prosecution claim.

### D.    Conclusion

For the reasons set forth above, **IT IS ORDERED** that Defendants' Motions for Summary Judgment **(ECF Nos. 20, 21)** are **GRANTED IN PART** and **DENIED IN PART**, as set forth above.

Dated: September 30, 2022                          s/David R. Grand
Ann Arbor, Michigan                                DAVID R. GRAND
                                                   United States Magistrate Judge

---

[21] Rogan argues that while "Quinn may not have started the [criminal] proceeding at the extreme beginning, [] his alleged actions in attempting to keep exculpatory evidence – which he knew from Plaintiff's in court statements – out of the hands of the jury creates a question of material fact for his continuance of the malicious prosecution."  (ECF No. 29, PageID.685).  But, Rogan cites neither record evidence nor case law in support of this proposition.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 30, 2022.

<u>s/Kristen Castaneda</u>
KRISTEN CASTANEDA
Case Manager